1
2
3
4
5
6
7
8
9            UNITED STATES DISTRICT COURT

10           EASTERN DISTRICT OF CALIFORNIA

11

12  LINDA K. DESROSIERS                    No.  2:09-cv-2057-MCE-GGH

13            Plaintiff,

14       v.                                **MEMORANDUM AND ORDER**

15  THE HARTFORD aka HARTFORD
    FIRE INS. CO., HARTFORD
16  FINANCIAL SERVICES GROUP, INC.,
    and DOES 1 through 20, inclusive,
17
            Defendants.
18

19

20       Through this lawsuit, Plaintiff Linda DesRosiers ("Plaintiff") asserts that her former

21  employer, Defendants The Harford (also known as Hartford Fire Ins. Co. and Hartford

22  Financial Services Group, Inc., hereinafter collectively referred to as "Hartford" or

23  "Defendants") failed to facilitate her ability to work as a Nurse Case Manager by

24  reasonably accommodating her longstanding physical disability (chronic fecal

25  incontinence).  Plaintiff's complaint, originally filed in the Superior Court of the State of

26  California in and for the County of Sacramento, was removed by Defendants to this

27  Court on grounds of diversity of citizenship pursuant to 28 U.S.C. §1332 and 1441(b).

28  ///

                                        1

1  Defendants now move for summary judgment, or alternatively for summary adjudication

2  of issues.  They argue  that each of Plaintiff's five causes of action, all of which are

3  asserted under the auspices of California's Fair Employment and Housing Act, California

4  Government Code § 12900, et seq. ("FEHA") fail because Plaintiff cannot establish

5  various essential prerequisites for the FEHA claims at issue.  Defendants further assert

6  that Plaintiff also has not demonstrated any entitlement to punitive damages under the

7  circumstances of this case.  As set forth below, the Court concludes that multiple issues

8  of material fact preclude summary adjudication as to any of Plaintiff's causes of action,

9  and with regard to the availability of punitive damages in this matter.

10

11                                    **BACKGROUND**[1]

12

13          On April 10, 2006, Plaintiff, a registered nurse, commenced employment with

14  Hartford as a Nurse Case Manager ("NCM") in its Workers' Compensation ("WC") unit in

15  Rancho Cordova, California.    The WC unit is located on the second floor of a three-

16  story building leased by Hartford, and is configured with approximately nine rows of

17  cubicles and a file storage area where injured workers' medical files are kept.  Kay Boyd,

18  a Team Leader with Hartford, was entrusted with overseeing NCMs in the Rancho

19  Cordova unit and was Plaintiff's immediate supervisor.

20          As an NCM, Plaintiff worked together with claims handlers, injured workers, and

21  medical providers in assessing appropriate treatment and whether and when an injured

22  worker can eventually return to work.  Plaintiff claims that prior to being hired, Ms. Boyd

23  told her that Hartford would be transitioning to a "remote" system within a year that would

24  allow telephone nurses to work from home.

25  ///

26  _____

          [1] The Court recognizes that the defense has submitted substantial objections to much of the
27  evidence cited to by Plaintiff in opposition to its request for summary judgment.  To the extent this
    background section cites to evidence that was subject to those objections, the objections are overruled.
28  The Court need not specifically rule on evidence not relied upon in this Memorandum and Order and does
    not do so.

1    According to Plaintiff, the option of working remotely was appealing to her

2  because of her medical condition.   In 1990, Plaintiff suffered a sphincter injury during

3  childbirth that resulted in chronic fecal incontinence and limited bowel movement control.

4  Further nerve damage occurred as a result of an unsuccessful surgical repair in 1997.

5  According to Plaintiff, her symptoms are unpredictable and exacerbated by stress.

6  Plaintiff's condition, particularly when combined with any clean-up delay, allegedly put

7  her at risk of developing vaginitis and urinary tract infections.  Plaintiff nonetheless did

8  not use adult diapers or other incontinence protection products, did not regularly take

9  any prescribed medication, and was not seeing a specialist during the time she worked

10  for Hartford.  Instead, the prophylactic measures she took consisted primarily of lining

11  her underwear with baby diapers.  See  Pl.'s Dep. 306:17-310:15.[2]

12    It is undisputed that Plaintiff did not disclose her condition to anyone at Hartford

13  before she was hired.  Plaintiff claims she believed that she could manage the problem

14  herself, especially given the fact that she had lived with the condition for many years and

15  had managed to stay working.  She also hoped to eventually work from home as Kay

16  Boyd had indicated.  In July of 2006, however, about three months after she was hired,

17  Plaintiff decided she had to request certain accommodations.  According to Plaintiff, her

18  cubicle in the second floor WC unit was some 93 feet from the doors leading to the

19  second floor restroom, and approximately 180 feet from the restroom itself.  Plaintiff felt

20  that distance, along with the lack of privacy in the restroom itself, prevented her from

21  quickly and effectively remedying any fecal incident.  Plaintiff therefore disclosed her

22  disability to Ms. Boyd, explaining that she needed immediate access to a restroom along

23  with privacy in order to properly clean up after any incident.  Plaintiff also requested that

24  she be permitted to work from home since that would address both her proximity and

25  privacy needs.

26  ///

27
_____

28
    [2] Complete deposition transcripts have been provided to the Court and will be cited to by page and line number throughout this Memorandum and Order.

1       Once Plaintiff's accommodation requests were made, Boyd contacted Robert

2 Hughes, Hartford's Regional Vice President for Worker's Compensation, and the

3 individual ultimately responsibility for determining what accommodations could be made.

4 Shelley Kelley, an Employee Relations ("ER") Consultant with Hartford, sent Ms. Boyd a

5 Job Modification Request form ("JMR") to be submitted by Plaintiff.

6       On or about July 31, 2006, Plaintiff's treating physician, J. B. Humphrey, M.D,

7 submitted a JMR to Hartford describing her condition as chronic anal incontinence,

8 secondary to surgery and an unsuccessful attempted surgical repair that caused

9 uncontrollable diarrheal bowel movement.  Dr. Humphrey concluded that the condition

10 affected Plaintiff's ability to work, and requested that she be provided "immediate access

11 to toilet facility – private, within 15 ft." or work from home where she can have immediate

12 access to toilet and freely clean up overflow."  See Ex. 33, ECF No. 52-1, p. 95.[3]

13 Thereafter, on September 1, 2006,  John W. Roberts, M.D., another of Plaintiff's treating

14 doctors, sent a letter to update Hartford on Plaintiff's condition and suggested

15 accommodations.  Dr. Roberts described Plaintiff as having a loss of anal sphincter tone,

16 discernible both objectively and subjectively, that frequently caused incontinence.  He

17 stated the condition was accompanied by irritable bowel syndrome and made worse by

18 anxiety over the possibility of soiling herself in public.  Dr. Roberts supported the

19 accommodations already requested by Dr. Humphrey, stating that Plaintiff needed either

20 a private office with attached restroom facility or the ability to work from home with ready

21 access to a toilet.  Dr. Roberts also recommended a less stressful work situation.

22 Ex. 52, ECF No. 52-3, p. 79.

23 ///

24 ///

25 ///

26

27 [3] The exhibits to depositions taken in this matter are numbered sequentially and have been attached by both parties to their respective Compendia of Evidence.  For ease of reference, the Electronic Case Filing ("ECF") reference and exhibit page reference will be used throughout this Memorandum and

28 Order with respect to those exhibits.

1        Plaintiff's JMR as submitted by Dr. Humphrey, along with Dr. Roberts' follow-up

2    letter, were reviewed by Dr. Edward Berman, a Corporate Medical Adviser for Hartford

3    entrusted with determining, by way of an independent review of the medical information

4    submitted to him, whether an employee's medical condition substantiates the requested

5    accommodation, or whether some other job modification is indicated.  On September 28,

6    2006, Dr. Berman sent an email indicating that after reviewing the medical records and

7    discussing the case with Plaintiff's treating physicians, he believed the medical

8    documentation submitted supported Plaintiff's request for either a private office with

9    attached restroom facility or work from home to facilitate ready bathroom access, as well

10   as a less stressful job situation.

11       Significantly, however, Dr. Berman's conclusion that the accommodations

12   requested by Plaintiff were justified from a medical standpoint did not mean that they

13   were reasonable under the circumstances and could be granted.  Instead, after Berman

14   submitted his findings, Plaintiff's supervisors, along with Hartford management, had to

15   make an additional determination as to whether the requested accommodations, or

16   some alternative thereto, could be reasonably granted.  This interactive process,

17   designed to identify accommodations which could address Plaintiff's needs, commenced

18   in July of 2006 and allegedly continued until the end of Plaintiff's employment in May of

19   2007.  It is undisputed that during this time period Plaintiff had various conversations

20   with Boyd, Kelley, Hughes and others at Hartford regarding her disability and potential

21   accommodations to address that disability, some of which were oral and some of which

22   were documented in email correspondence.

23       On November 9, 2006, Plaintiff was informed that her "telecommuting" request

24   was denied.  No reasons for that rejection, which came some five months after her

25   request was initially made in July, were given and, according to Plaintiff, no other

26   accommodations were offered.   Plaintiff claims her alternative requests for privacy and

27   for immediate proximity or access to a restroom were not addressed at all.   ECF

28   No. 52-4, p. 115.

1    Kelley nonetheless admitted that as of December 14, 2006, her records showed that

2    Hartford considered the case involving Plaintiff's accommodations to be essentially

3    "closed" even if talk continued about what could be done.  Kelley Dep., 108:6-109:1.

4          Subsequently, on January 30, 2007, Plaintiff emailed Shelley Kelley in ER and

5    told her that her request was not simply about "telecommuting."  Instead, she asked for a

6    "decision about whether or not accommodations will be considered and if not, the

7    reasons why."  Ex. 8, ECF No. 52, pp. 78-79.  On February 5, 2007, Kelley replied to

8    Plaintiff and again indicated only that working from home was not reasonable from a

9    business perspective.  Id. at p. 77.  That same day, Plaintiff claims her supervisor, Kay

10   Boyd, told her that her evaluation ratings had decreased and that she would need to do

11   monthly evaluations as to Plaintiff's job performance, a development that Plaintiff viewed

12   as retaliatory and intimidating.  Ex. 45, ECF No. 52-3, p. 61; Pl.'s Decl., ¶ 12.  Then, on

13   February 8, 2007, Kelley acknowledged that a private office with attached restroom had

14   been requested, but told Plaintiff her request was not reasonable because Hartford's

15   facilities did not provide such an option.  Id.  Hartford's decision in that regard came

16   some seven months after Plaintiff initially requested that particular accommodation.

17   Plaintiff claims that no alternatives to Plaintiff's request for ready restroom access, or for

18   stress reduction, were offered.  When Plaintiff continued to request further explanation,

19   she was referred to Regional Vice President Hughes.

20          On February 16, 2007, Plaintiff emailed Hughes with the following query:

21          Why would an office with bathroom not be reasonable?  Is
             the cost?  Limitations with what can be done here in the
22           office?  Other?
             OR
23           Why can't my position be done remotely?

24   Ex. 34, ECF No. 52-1, p. 98.

25          On February 19, 2007, Hughes wrote back to Plaintiff and told her that the

26   requested accommodation of an office with a restroom was rejected because of

27   excessive cost.

28   ///

1    He indicated he believed that costs for such a retrofit could approach $100,000, and

2    believed that other employees could be "distracted" by Plaintiff receiving such a

3    substantially improved working space.  With respect to working from home, Hughes

4    stated that "[a] foundation to our business model's success is having nurses co-located

5    with claims' professionals," and explained that the ease of such collaboration "improves

6    our efficiency, productivity and claim outcomes."  Ex. 35, ECF No. 52-1, p. 103.  In fact,

7    Hughes told Plaintiff that there was "no precedent for any nurse case manager working

8    remotely from home in the WC organization."  Id.

9         Hughes later admitted that he never obtained any actual cost estimates for

10   construction of a private office and adjoining restroom for Plaintiff, and that the $100,000

11   figure  he offered was not based on any cost or build-out analysis.  Hughes Dep., 56:8-

12   57:8, 64:10-18.  Hartford does claim, however, that it required NCMs like Plaintiff to have

13   access to the most current medical information available in each injured workers' claim

14   file.  During the time period when Plaintiff's accommodations were considered in 2006

15   and 2007, some, but not all, medical information could be accessed by computer.

16   According to Hartford, however, much information, including certain correspondence and

17   reports, existed only in paper "hard copy" form that was stored primarily in physical files

18   within the WC unit.  Decl. of Paula Beland, ECF No. 45-10, ¶ 3; Decl. of Robert Hughes,

19   ECF No. 45-12, ¶ 4.  Hartford therefore claims it reasonably required attendance to be

20   an essential job function for NCMs given this limitation.  In fact, no NCM for Hartford

21   worked remotely in 2006 or 2007.  Defs.' Undisputed Fact ("UF") No. 41.  The  Electronic

22   Data Management ("EDM") system that put the infrastructure in place to allow Hartford

23   NCMs to work from home was not completed until approximately August 4, 2009, well

24   after Plaintiff's tenure with the company ended, and not until some $6 million had been

25   expended in rolling out the EDM program.  Id. at UF Nos.  44, 45.

26        On February 23, 2007, after Hughes had rejected both working from home and

27   the construction of a private office with adjoining bathroom, Plaintiff wrote again to

28   Hughes asking for additional accommodations.

7

1    She requested that fewer files be assigned to her for handling, that she be allowed time

2    away from her desk in the event of a fecal emergency, and that she be given closer

3    parking to afford easier access.  Plaintiff also asked Hughes for "any other

4    accommodation ideas."  Ex 11, ECF No. 52, p. 89. When Hughes forwarded Plaintiff's

5    email to Shelley Kelly in ER, he included the following message:

6              Shelley,

7              This needs to stop.  How firm a message can be sent that all
               decisions are final and no further accommodations will be
8              made? I'm at the point where I want to stop the part time
               FMLA [Family Medical Leave Act] as well.  Please review and
9              advise.  Thanks, Robert

10   Ex. 10, ECF No. 52, p. 86.[4]

11         Hughes claims he was frustrated both because he felt that he was having to

12   answer the same inquiries from Plaintiff on multiple occasions, and because he believed

13   she should have mentioned any other potential accommodations she wanted initially

14   rather than on a cumulative basis as the interactive process continued.  As Hughes

15   testified, "[w]e communicated the decision on the accommodations she requested and

16   then four new ones came up in the same week."  Hughes Dep.; 160:1-9.  Kelley, for her

17   part, claims she immediately told Hughes by telephone that Hartford was required to

18   continue to engage in an interactive process with Plaintiff  irrespective of whether he was

19   frustrated.  Kelly Dep., 132:7-16.

20         On February 23, 2007, Hughes advised Plaintiff by email that any additional job

21   modifications had to be formally requested through a new MJR, despite the fact, as

22   discussed above, that Plaintiff's doctors had already submitted two such forms in July

23   and September of 2006.  Ex. 12, ECF No. 52, p. 91. That same day, Shelley Kelley

24   advised Hughes to stop communicating with Plaintiff by email unless she complied with

25   Hartford's request in that regard.  Ex. 11, ECF No. 52, p. 88.

26   ///

27   _____

     [4] According to Shelley Kelley, Plaintiff was not in fact on FMLA but instead had been on short-term
28   disability as a result of a car accident and had returned to work on a shortened-hour basis.  Kelley testified
     she let Hughes know he was wrong about the FMLA issue.  Kelley Dep., 136:19-25.

1   Kelley also told Hughes that while Plaintiff wanted to communicate on a more informal

2   basis, "we have to keep her tied into the appropriate process."  Ex. 13, ECF No. 52,

3   p. 93.  Hughes accordingly sent the following note to Plaintiff:

> You are requesting several new job modifications that were
> not previously requested.  Your medical provider must submit
> medical    documentation    that    substantiates    any    job
> accommodation requests.  These requests must go through
> our  Job  Modification  Process  to  ensure  that  proper
> documentation and medical review is provided.  To request
> these  new  accommodations,  you  must  initiate  the  Job
> Modification Forms again.

9   Ex. 16, ECF No. 52, p. 104.

10          Plaintiff claims she perceived this directive as an effort to thwart the interactive

11  process.  She replied to Hughes on February 26, 2007, with the following plea:

> My condition/disability is lifetime, as previously documented.
> My  provider  and  I  have  submitted  all  requested
> documentation to your office back East and your physician
> has verified my disability.  It takes management for me to get
> through  every  day.   This  whole  process  has  been  time
> consuming for my physician, and myself.   In addition, it is
> embarrassing and difficult for me.   I really don't see how
> starting  this  process  all  over  again  is  reasonable  or
> necessary.   Can  you  please  just  consider  what  I  am
> requesting, based on the information I have already provided.

18  Id.

19          Hughes, after requesting input from Hughes on how to respond to Plaintiff,

20  advised her to "[p]lease discontinue your direct requests to me as the answer will not

21  change.  Id., see also Exs. 14-15, ECF No. 52, pp. 96, 100-01.  Plaintiff states that

22  following this interchange, she feared  that Hartford had no intention of working with her

23  in order to reach accommodations that would keep her employed.  See Pl.'s Decl., ¶ 31.

24          Then, on February 28, 2007, Boyd met with Plaintiff and told her that she would

25  not be allowed to leave the office as a shower was available on the first floor.

26  ///

27  ///

28  ///

1    Boyd also told Plaintiff she could ask her doctor for a handicapped placard to use for

2    parking, that she would be required to carry as many files as the other NCMs, and that

3    she would need to make up time taken away from her desk to attend to bathroom needs

4    that same day.  In a second meeting, also on February 28, 2007, Plaintiff alleges that

5    Boyd told her that Hughes would understand if she "would be happier somewhere else."

6    Pl.'s Decl., ¶ 33; Ex. 45, ECF No. 52-3, pp. 63-64

7         Although Plaintiff's treating physician, Dr. Roberts, submitted an additional JMR

8    form on March 19, 2007, that indicated no improvement was expected and that Plaintiff

9    "needs immediate bathroom access or about 15 [feet]," Hartford's Medical Consultant,

10   Dr. Berman, concluded on March 29, 2007, that "the medical documentation presented

11   does not substantiate any of the requested limitations or modifications."  See Ex. 89,

12   ECF No. 52-4, pp. 66, 72.  Inexplicably, that denial was based on the same information

13   that he had previously relied upon to conclude in October of 2007 that Plaintiff's medical

14   condition substantiated the accommodations she requested.  Berman Dep., 112:10-21.

15        On April 3, 2007, Plaintiff personally met in person with Kay Boyd and Boyd's

16   immediate supervisor, Medical Program Manager Trenton Koch.  Shelley Kelley

17   participated by telephone.  Plaintiff claims that Kelley told her that Berman had changed

18   his recommendation because he knew that Hartford could not accommodate Plaintiff's

19   requests, even though it was Hughes, not Berman, who had to decide whether the

20   requested accommodations were reasonable.  Ex. 45, ECF No. 52-3, p. 67; Pl.'s Decl.,

21   ¶ 37.  Plaintiff states Kelley reiterated that the private office/bathroom and work from

22   home requests were denied, and that it was not up to the Hartford to come up with

23   recommendations or to reconfigure its business model.  Id.  Plaintiff also claims Boyd

24   told her, given the 16 year period she had lived with her disability, that Plaintiff should

25   have known before taking the Hartford position if the job would accommodate her

26   condition.  Id. at p. 68.

27   ///

28   ///

1  According to Plaintiff, the only accommodations mentioned were the use of a shower on

2  the first floor, the use of a locker adjacent to that shower to store extra clothing and

3  supplies, the use of another work station on the second floor that Plaintiff had already

4  rejected as too "central" to afford any privacy whatsoever, and the ability to take up to

5  30-45 minutes away from her desk to clean up if she made up the time the same day.[5]

6  Otherwise, Plaintiff claims she was told that Hartford's decisions were "final."  Ex. 20,

7  ECF No. 52, p. 111.  These same accommodations were also documented in an email

8  from Shelley Kelley to Robert Hughes, summarizing the April 3, 2007, meeting.  Ex. 19,

9  ECF No. 52, p. 108.  That email made it clear that Hartford considered the interactive

10  process finished:

11  
12  
13  
14  
15  

> I informed Linda that these decisions that these decisions have been made by you and they are final… We also reminded Linda that she was aware of the confines of this job when she took the job and that she had this physical condition at that time.   We have not changed our requirements during that time and for the foreseeable future, we do not plan on changing them.  The onus [is] on Linda to decide if she can work within these confines.   We also advised Linda that you consider this conversation finished.

16  Id.

17       Plaintiff nonetheless insists that she repeatedly told Hartford that a shower on the

18  first floor would not work as long as she was required to work on the second.  As she

19  reiterated in an April 17, 2007, email requesting reconsideration of Hartford's position,

20  any such proposal could not

21  
22  
23  
24  

> reasonably accommodate me since I am on the second floor. I must walk past many people and either get onto the elevator, or take a flight of stairs as my loose liquid stool seeps out uncontrollably with every step… The distance to the shower on the first floor makes it impossible for me to use it.

25  Ex. 20, ECF No. 52, p. 113.

26  ///

27  ///

28  
_____

[5] This was also documented in Kelley's email documenting the meeting.  PUF 27.

11

1   Plaintiff added that without even a door latch on the shower stalls, there was no privacy

2   in the first floor restroom, and that the thought of others seeing her while in the process

3   of cleaning up was "very stressful, degrading, and humiliating." Id., see also Pl.'s Decl.,

4   ¶ 38.

5           While Plaintiff claims a position on the first floor adjacent to the restroom would

6   have been a reasonable accommodation, particularly if the restroom was modified to

7   provide reasonable privacy and security, she claims that option was never offered.   Pl.'s

8   Decl., Ex. 20, DUF 31.  When she asked about relocating her cubicle to the first floor,

9   Hughes rejected that accommodation on several grounds,  First, such a move would

10  have separated Plaintiff from the other claims professionals" which Hughes explained

11  was "core to [Hartford's] business model."  Hughes Dep. 194:20-195:2.  Second, in the

12  event of such a move, Hughes testified he would have had to rent Plaintiff's cubicle from

13  another Hartford subsidiary, which he felt posed a "budgetary constraint."  Id. at 195:3-6

14  Hughes conceded however, that assuming that additional rent obligation would not have

15  been a "huge factor."  Id. at 198:19-25.  Third, security concerns were cited given

16  Hartford's security protocols designed to protect WC claimant's confidential medical

17  information.  The WC unit was located in a secured area separated from other areas of

18  the building by a locked security door with entry limited by access card.  Medical files or

19  correspondence were not permitted outside that area.  Defs.' UF No. 37.  A locked cart

20  to move files back and forth between floors, however, could possibly have obviated

21  Hartford's security concerns.  See Koch Dep., 74:22-75:23.

22          Hartford points to Plaintiff's admission that she had accidents at home, even when

23  within 20 feet of a restroom, as evidence that moving Plaintiff closer to bathroom

24  facilities at work would not have prevented Plaintiff's fecal incontinence episodes.  See

25  DUF 60.  Shelley Kelley nonetheless understood that size and scope of any accident

26  was mitigated by being close to a restroom.  Plaintiff told Kelley that quick access to a

27  facility helped to keep a relatively minor mess from turning into a "stinking disaster."

28  Kelley Dep., 80:10-14.

1    Plaintiff's April 17, 2007, reconsideration request was rejected in short order.

2  Trenton Koch wrote to Hughes on April 18, 2007, both in response to Plaintiff's request

3  and regarding the previous April 3, 2007, meeting.  He stated:

> We made it very clear to her that we have made all the
> accommodations we can and that she must now make the
> decision if she can work within our abilities and operational
> model.  We also made it very clear that without a change in
> her condition or diagnosis the issue has been reviewed twice
> now and that it is considered closed.

8  Ex. 21, ECF No. 52, p. 116; see also Koch Dep., 116:20-117:13.

9    On May 3, 2007, after Dr. Roberts had again written to Dr. Berman asking that

10  additional accommodations be made, Hughes scheduled another personal meeting with

11  Plaintiff, with Shelley Kelley participating by telephone.  Plaintiff reiterated her concerns

12  about adequate privacy in the first floor restroom, and Hughes offered in response to put

13  a lock in the first floor shower area.  When Plaintiff also expressed embarrassment about

14  having to walk past co-workers with soiled clothing on the way to the restroom, Hughes

15  suggested she keep a long garment at her cubicle, like a trench coat, for use in the

16  event of a fecal episode.  He also offered to get a hook or coat rack for Plaintiff to store

17  the garment in her cubicle.  Plaintiff was offended by Hughes' garment suggestions and

18  felt it was yet another way of pushing her out.   Exs. 24-25; ECF No. 52, pp. 120-22; Pl.'s

19  Dep., 213:11-214:4.   Hughes reportedly went so far as to end the meeting by telling

20  Plaintiff that while he was glad to keep her as an employee, he would understand "if she

21  would be more comfortable taking a job somewhere else."  Ex. 56, 24, 45.

22    After Hughes queried Plaintiff about why she had not responded to the

23  suggestions he made at the aforementioned May 3, 2007, meeting, Plaintiff sent an

24  email on May 30, 2007, again requesting that Hartford reconsider some of the

25  accommodations she suggested and rejected Hartford's own proposals, which she

26  explained failed to adequately address her condition.   Plaintiff told Hughes that working

27  under the conditions she faced "interferes with my ability to concentrate, communicate

28  and do my job."  Ex. 25, ECF No. 52, p. 122.

1    On June 27, 2007, Kelley called Plaintiff and told her that she had had exhausted

2    her allotment of personal time off credits ("PTO") for absence and would have to report

3    further absences as unexcused ("PTU").  Kelley warned Plaintiff that PTO had limits and

4    that if she exceeded those limits she would face termination.  Ex. 45, ECF No. 52-3,

5    p. 73; Pl.'s Decl., ¶ 44.  According to Plaintiff, this call was very upsetting and "caused

6    multiple diarrheal incontinent attacks."  Id.  Then, on July 2, 2013, Kay Boyd tried to

7    interest Plaintiff in taking a job elsewhere.  Plaintiff told Boyd that she had still not

8    received a response to her email of May 30, 2007.   Pl.'s Decl., ¶ 45.  The following day,

9    Ms. Boyd initiated a disciplinary plan against Plaintiff on grounds that her scores as an

10   NCM were slipping, that she had used up all her accrued PTO time and, in addition, had

11   four PTU occurrences.  Ex. 27, ECF No. 52, p. 127.

12   On July 12, 2007, Plaintiff submitted a letter of resignation, effective July 31,

13   2007, to Robert Hughes, citing Hartford's refusal to adequately accommodate her

14   disability.  Plaintiff stated in part as follows:

15
          I am, understandably, disappointed and quite shocked that a
16        company, such as The Hartford, refuses to offer reasonable
          accommodations to keep a valued nurse/employee with more
17        than 16 years of case management experience.  Despite my
          exhausting, numerous requests for accommodations, nothing
18        reasonable has been offered.  In fact, my last [May 30, 2007]
          letter to you requesting continued communication for these
19        efforts was never even acknowledged, or responded to, by
          you.
20
          …
21        The Hartford has forced me out, denied me reasonable
          accommodations, and has refused to engage in any real
22        discussions of my needs.  My patient requests and my
          doctor's explanations have been met with insults and
23        stonewalling….

24   Ex. 63, ECF No. 45-6, pp. 56-57.

25   Although Plaintiff had originally planned on continuing work through the end of

26   July 2007, she states that when she came to work the day after her resignation, she felt

27   could not continue due to the mistreatment and humiliation she had endured.  Therefore,

28   she decided to immediately terminate her employment.

1

**STANDARD**

2

3          The Federal Rules of Civil Procedure provide for summary judgment when "the

4    pleadings, depositions, answers to interrogatories, and admissions on file, together with

5    affidavits, if any, show that there is no genuine issue as to any material fact and that the

6    moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex

7    Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is

8    to dispose of factually unsupported claims or defenses.  Celotex Corp., 477 U.S. at 325.

9    Where, as here, the defense is moving for summary judgment, the Supreme Court has

10   also noted that judgment as a matter of law is appropriate "when the plaintiff fails to

11   make a showing of an element essential to that party's case, and on which that party will

12   bear the burden of proof at trial."  Id. at 322.

13         Rule 56 also allows a court to grant summary adjudication on part of a claim or

14   defense.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment,

15   identifying . . . the part of each claim or defense . . . on which summary judgment is

16   sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal.

17   1995); France Stone Co., Inc. v. Charter Twp. of Monroe, 790 F. Supp. 707, 710 (E.D.

18   Mich. 1992).

19         The standard that applies to a motion for summary adjudication is the same as

20   that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a), 56(c);

21   Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

22                    Under summary judgment practice, the moving party always
                     bears the initial responsibility of informing the district court of
23                   the basis for its motion, and identifying those portions of 'the
                     pleadings, depositions, answers to interrogatories, and
24                   admissions on file together with the affidavits, if any,' which it
                     believes demonstrate the absence of a genuine issue of
25                   material fact.

26   Celotex, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

27   ///

28   ///

15

1    If the moving party meets its initial responsibility, the burden then shifts to the

2    opposing party to establish that a genuine issue as to any material fact actually does

3    exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986);

4    First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

5    In attempting to establish the existence of this factual dispute, the opposing party

6    must tender evidence of specific facts in the form of affidavits, and/or admissible

7    discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P.

8    56(c).  The opposing party must demonstrate that the fact in contention is material, i.e., a

9    fact that might affect the outcome of the suit under the governing law, and that the

10   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

11   for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52

12   (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347,

13   355 (9th Cir. 1987).  Stated another way, "before the evidence is left to the jury, there is

14   a preliminary question for the judge, not whether there is literally no evidence, but

15   whether there is any upon which a jury could properly proceed to find a verdict for the

16   party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251

17   (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).  As the Supreme Court

18   explained, "[w]hen the moving party has carried its burden under Rule 56(c), its

19   opponent must do more than simply show that there is some metaphysical doubt as to

20   the material facts . . . .  Where the record taken as a whole could not lead a rational trier

21   of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita,

22   475 U.S. at 586-87.

23   In resolving a summary judgment motion, the evidence of the opposing party is to

24   be believed, and all reasonable inferences that may be drawn from the facts placed

25   before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

26   255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

27   obligation to produce a factual predicate from which the inference may be drawn.

28   ///

1   Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

2   810 F.2d 898 (9th Cir. 1987).

3

4                                       **ANALYSIS**

5

6           Hartford argues that Plaintiff has not stated viable claims under FEHA

7   because she failed to establish the prerequisites for the various causes of action she

8   asserts under California's anti-discrimination laws.  Certain of those requirements are

9   common to several of Plaintiff's individual claims.  Defendants move for summary

10  adjudication, for example, as to both Plaintiff's claims for disability discrimination, failure

11  to accommodate and failure to engage in an interactive process with respect to

12  accommodation (Plaintiff's First, Second and Third Causes of Action, respectively) on

13  grounds that Plaintiff  has not established that she is a  "qualified individual" entitled to

14  protection as to those claims.  Defendants further claim that because "reasonable

15  accommodations" were afforded to Plaintiff in response to her disability, she also cannot

16  prevail as to either her failure to accommodate or interactive process claims.  Similarly,

17  common to both Plaintiff's discrimination and retaliation claims (her First and Fourth

18  Causes of Action) is the requirement that Plaintiff be subjected to an adverse

19  employment action, which Defendants assert she has not established.   The defense

20  also maintains that they have established as a matter of law that they did engage in an

21  interactive process and that they cannot be liable for failing to prevent and remedy

22  discrimination.  Finally, with respect to Plaintiff's punitive damages, Defendants assert

23  that claim also has no merit both because no officer, director or managing action of

24  Hartford engaged in any of the allegedly wrongful conduct at issue, and because Plaintiff

25  cannot prove the oppression, fraud or malice essential to any claim for exemplary

26  damages in any event.  Each of Defendants' assertions in favor of summary adjudication

27  as to Plaintiff's various claims will now be addressed.

28  ///

1

2

### A. Qualified Individual

3        Under the provisions of FEHA, the term "qualified individual" means a person with

4   a disability who can, either with or without reasonable accommodations, perform the

5   essential duties of his or her job.  <u>Green v. State of California</u>, 42 Cal. 4th 254, 262

6   (2007).   In moving for summary judgment, the defense offers two arguments with

7   respect to this prerequisite for liability on Plaintiff's claims of disability discrimination,

8   failure to accommodate and failure to engage in an interactive process towards

9   accommodation.  Defendants first argue that Plaintiff, in essence, had no disability at all

10   because she was able to perform the essential functions of her job without any

11   accommodation.  While it is true that Plaintiff testified she continued to work since her

12   failed surgical repair despite her disability, that does not mean she did so without

13   difficulty.  The record is replete with descriptions of the supplies and extra clothing

14   Plaintiff had to bring with her in the event an incontinence episode occurred, and Plaintiff

15   unequivocally told Hartford her disability is "lifetime" and that "[i]t takes management for

16   me to get through every day."  Ex. 16, ECF No. 52, p. 104.  As indicated above, despite

17   Defendants' apparent contention to the contrary, the term "qualified individual" does not

18   rule out a disabled individual able to perform the essential duties of his position even

19   without accommodation.  Instead, the key requirement is that the individual suffers from

20   a disability that "limits an individual's ability to participate in major activities" in the sense

21   that the handicap makes the achievement of such activities "unusually difficult."

22   <u>Colmenares v. Braemar Country Club, Inc.</u>, 29 Cal. 4th 1019, 1025 (2003).

23        Plaintiff  unquestionably has a disability that makes major activities "unusually

24   difficult," to say the least.  She suffers from uncontrolled fecal seepage and incontinence

25   that can afflict her at any moment.  The fact that Plaintiff could generally do her job with

26   careful planning does not obviate either her disability or her status as a qualified

27   individual.

28   ///

1  Defendant's argument that it "had no legal duty to accommodate" because Plaintiff could
2  do her job without accommodation therefore fails since it is undisputed that her disability
3  made it harder for her to do so.  That is all that is required under FEHA for Plaintiff to be
4  a qualified individual.
5      In their second argument, the defense takes an entirely difficult tack in arguing
6  that Plaintiff cannot meet the basic prerequisites for being considered a qualified
7  individual in any event if the accommodations she requires impinge upon the essential
8  functions of an NCM.   In short, Defendants maintain that if the only effective
9  accommodations for Plaintiff would be to dispense with such essential duties as working
10  with other claims professionals in the office and maintaining a minimum case load, then
11  such accommodations are per se unreasonable.  As discussed below with respect to the
12  reasonableness of any potential accommodations, however, any such issue necessarily
13  entails weighing a plethora of factual concerns that cannot be adjudicated by way of
14  summary judgment.
15
16      **B.  Reasonable Accommodations**
17
18      Defendants argue that because they "offered several accommodations and
19  rejected only those that were not reasonable, Plaintiff's claims fail as a matter of law."
20  Defs.' Opening Points and Authorities, 17:15-16.  Hartford largely focuses on Plaintiff's
21  request for an office with private bathroom, and her request to work from home as
22  examples of requests that were clearly unreasonable.  As the papers make clear,
23  however, and as the preceding factual discussion amply demonstrates, this case
24  involves numerous accommodation requests, and the consideration of numerous factors
25  (which run the gamut from security and collaboration to privacy and proximity) that raise
26  numerous triable issues not amendable to determination as a matter of law through
27  summary judgment.
28  ///

1    Plaintiff's request for an office closer to the restrooms on the first floor is but one

2  example.  Just what changes to the configuration of the restroom to accommodate

3  Plaintiff's privacy concerns were reasonable all raise matters that must be left to the trier

4  of fact.  The same holds true for whether Hartford could reasonably be required to make

5  various changes to its security protocols for confidential patient information that would

6  have included moving patient data from its secured location on the second floor to the

7  first floor (through use of a locked cart, for instance).

8    How close Plaintiff needed to be to a restroom and what features the restroom

9  had to afford in order to reasonably accommodate her incontinence is also an area of

10  sharp dispute.  Hartford argues that because Plaintiff admitted to having accidents at

11  home at distances closer to a restroom than any desk at Hartford, no accommodation it

12  could have offered would have been reasonable.  Plaintiff countered by pointing out that

13  proximity prevented a relatively minor incident from becoming a "stinking disaster" so

14  that distance in fact was the crucial factor.  Just what desks were available outside

15  Hartford's WC unit, and whether placement at those desks would have been reasonable

16  from a cost and/or collaboration standpoint, is also in dispute.

17    While the Court could cite to numerous other disputed issues with respect to

18  whether the accommodations sought or provided were reasonable, even a cursory

19  review of the facts of this matter shows that the whole issue abounds with factual

20  dispute.  The defense's request for summary adjudication as to the reasonableness of

21  any accommodations necessarily fails.

22

23    **C.  Interactive Process**

24

25    Under FEHA, an employee is required to "engage in a timely, good faith,

26  interactive process… to determine effective reasonable accommodations… in response

27  to [an employee's] request for reasonable accommodation…"  Cal. Gov't Code

28  § 12940(n).

1  This process requires an employer to explore alternatives that may accommodate its

2  employee's disability.   Wysinger v. Automobile Club of So. Cal., 157 Cal. App.4th 413

3  424 (2007).  An employee need only give notice of his or her disability and potential

4  need for accommodation in order to trigger the employer's duty to engage in this

5  cooperative, interactive process.  See Prilliman v. United Airlines, 53 Cal. App. 4th 935,

6  950-51 (1997).

7        Defendants' initial argument is that because it provided a reasonable

8  accommodation, Plaintiff cannot assert any valid claim for failure to engage in the

9  interactive process.  Defs.' Opening Points and Authorities, 18:20-21.  Defendants

10  reiterate that same argument in their reply papers.  Reply, 7:10-13.  Because the Court

11  finds triable issues with respect to whether reasonable accommodations were made as

12  set forth above, the fundamental basis for Defendants' summary adjudication request as

13  to the interactive process would appear lacking.

14        A closer examination of the merits of the interactive process claim is no more

15  helpful to the defense.  An employer like Hartford cannot prevail on summary judgment if

16  there is any "genuine dispute as to whether the employer engaged in good faith in the

17  interactive process."  See Barnett v. U.S. Air, 228 F.3d 1105, 1116 (9th Cir. 2000) (en

18  banc).  In addition, a plaintiff is "required to produce 'very little' direct evidence of an

19  employer's discriminatory intent to move past summary judgment."  Morgan v. Regents

20  of Univ. of Cal., 88 Cal. App. 4th 52, 69 (2000).

21        Here, as set forth above, Hartford's decision-maker in this matter, Robert Hughes,

22  sent Shelley Kelley an email on February 23, 2007 demanding that any further

23  interactive process stop and reiterating  both the finality of his decisions and the fact that

24  no further accommodations will be made. Ex. 10, ECF No. 52, p. 86.   On April 3, 2007,

25  HR representative Shelley Kelley wrote Hughes and told him that the "onus is on

26  [Plaintiff' to decide if she can work within [Hartford's] confines … we have not changed

27  our requirements … and for the foreseeable future, we do not plan on changing them…"

28  Ex. 19, ECF No. 52, p. 108.

1   Additionally, as outlined in the factual background section of this Memorandum and

2   Order, it took as long as seven months for Defendants to respond to some of Plaintiff's

3   accommodation requests.  Finally, in making suggestions like Hughes' questionable

4   proposal that Plaintiff should keep a long trench coat at her work cubicle so she could

5   cover up before rushing to the restroom, also raises triable issues as to whether Hartford

6   even intended to offer reasonable accommodations.

7       The Court agrees that Plaintiff is also responsible for participating in good faith in

8   the interactive process.  The Court recognizes that there are issues here with respect to

9   whether Plaintiff herself took proper responsibility for mitigating the severity of her

10  episodes.[6]   Nonetheless, on summary judgment, all reasonable inferences must be

11  drawn in favor of the opposing party, here Plaintiff  (Anderson, 477 U.S. at 255) and the

12  evidence as presented is certainly susceptible to a conclusion that Hartford failed to act

13  in good faith in pursuing the interactive process.   Summary adjudication as to that issue

14  accordingly cannot be granted.

15

16          **D.  Adverse Employment Action**

17

18      Defendants properly point out that an adverse employment action is a

19  prerequisite both for establishing a viable disability discrimination claim (Plaintiff's First

20  Cause of Action) and for stating an actionable claim based on retaliation (Plaintiff's Fifth

21  Cause of Action).  See King v. United Parcel Service, 152 Cal. App. 4th 426 (the

22  existence of an adverse employment action a necessary element of employment

23  discrimination claim); Miller v. Dept. of Corr., 36 Cal. 4th 446, 472 (2005) (adverse action

24  also needed for retaliation).

25  ///

26      [6] As indicated above, Plaintiff admitted that she only lined her underwear with baby diapers, did
    not use adult diapers or other incontinence protection products, did not take any medication, and was not
27  seeing a specialist.  Pl.'s Dep. 306:17-310:15..  Defendants' medical expert, gastroenterologist Thomas
    Hargrave, M.D., felt these mitigation efforts were grossly inadequate on Plaintiff's part.  Decl. of Thomas
28  Hargrave, ¶¶ 3-6.

1    The Defendants contend that because Plaintiff herself resigned when the

2    interactive process was still allegedly ongoing, there can be no adverse employment

3    action.  Plaintiff, on the other hand, argues that the protracted accommodation process,

4    as well as the insufficiency of the measures that were offered and the way she was

5    treated throughout the process, in fact turned her resignation into a constructive

6    discharge since she asserts she had no choice but to leave Hartford's employ under

7    those circumstances.

8    In order to prove a constructive discharge, Plaintiff must show that Hartford "either

9    intentionally created or knowingly permitted working conditions that were so intolerable

10   or aggravated at the time of the employee's resignation that a reasonable employee

11   would realize that a reasonable person in the employee's position would be compelled to

12   resign."  Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1251 (1994).

13   Again, whether or not Hartford's handling of her accommodation requests

14   rendered Plaintiff's employment so untenable as to force her resignation and constitute a

15   constructive discharge presents factual questions far beyond the purview of a motion for

16   summary judgment.  As indicated above, a number of events and or circumstances have

17   to be weighed in determining whether any constructive termination may have occurred,

18   including the content of certain emails from Hartford, disciplinary action instituted by

19   Hartford on the heels of Plaintiff's efforts to secure needed accommodations (incidents

20   occurring on February 5, 2007, and June 27, 2007, respectively[7]), statements from both

21   Hughes and Boyd inferring that she should look for employment elsewhere, and the fact

22   that Plaintiff claims her incontinence problems were exacerbated by stress associated

23   with an accommodation process that had lasted nearly a year.

24   ///

25   ///

26   ///

27

28   _____

[7] These disciplinary issues also raise triable issues of fact as to whether Plaintiff was in fact subjected to retaliation for pursuing the accommodations she requested.

1

### E.  Failure to Prevent and Remedy Discrimination

2

3        Defendants' argument for summary adjudication as to Plaintiff's Fifth Cause of

4   Action, for failure to prevent and remedy discrimination, rests on the argument that

5   "[b]ecause Plaintiff cannot establish that unlawful discrimination or retaliation occurred,

6   her claim for failure to prevent discrimination must be dismissed as a matter of law."  See

7   Defs.' Opening Points and Authorities, 24:23-26.  Because the Court has in fact

8   concluded otherwise, that argument fails.   Defendants also argue that because they had

9   anti-discrimination and anti-retaliation policies in effect, they cannot be liable for failure to

10  prevent "even if discrimination and/or retaliation had occurred."  Id. at 24:28-25:3.  The

11  Court also rejects that contention.  As Plaintiff points out, a policy manual cannot

12  become a free pass for unlawful conduct in the event Defendants chose to ignore its

13  strictures.

14

15         ### F.   Entitlement to Punitive Damages

16

17        Under California law, the entitlement to punitive damages against an employer

18  like Hartford hinges on proof, by clear and convincing evidence, that an "officer, director

19  or managing agent" of the company perpetrated or knowingly ratified conduct amounting

20  to malice oppression or fraud.  Cal. Civ. Code § 3294(b); College Hospital Inc. v. Sup.

21  Ct., 8 Cal. 4th 704, 723 (1994).  Defendants here argue that under the circumstances of

22  the present case, neither the "officer, director or managing agent" or the requirement that

23  the conduct entail "malice, oppression or fraud" can be established.  Therefore, they

24  urge the Court to find punitive damages unavailable as a matter of law.

25        With respect to the first prong, Defendants argue that Robert Hughes, the final

26  decision-maker with respect to accommodating Plaintiff, has never been an officer or

27  director of Hartford.  According to the defense, Hughes can only potentially qualify for

28  inclusion under § 3294 if Plaintiff can show he is a "managing agent" for Hartford.

1   To do that, Defendants argue that Plaintiff must show Hughes was a corporate

2   employee with "substantial independent authority and judgment in [his] decision making

3   so that [his] decisions ultimately determine corporate policy."  White v. Ultramar, Inc., 21

4   Cal. 4th 563, 566-67 (1999).

5            In an attempt to avoid the moniker of "managing agent," Hartford describes

6   Hughes as a mid-level manager who supervised only about 100 employees, a small

7   fraction of Hartford's 29,000 employees nationwide.  Defs.' UF 113-117, 141.

8   Defendants maintain that Hartford's corporate policies are developed and authorized by

9   its home office executives in Hartford, Connecticut.  Id. at 110.

10           Whether or not an employee qualifies as a "managing agent" is not as simple as

11   Defendants would lead the Court to believe.  The California Supreme Court's decision in

12   White v. Ultramar recognizes that managing agent status "does not depend on [the]

13   employee['s] managerial level, but on the extent to which they exercise substantial

14   discretionary authority over decisions that ultimately determine corporate policy."  White,

15   21 Cal. 4th at 576-77.   The requisite discretionary authority over "policy" includes,

16   according to White, "decisions that resulted in an 'ad hoc formulation of policy.'"  Id. at

17   571.   Significantly, Robert Hughes' territory included operations in five states, Alaska,

18   Washington, Oregon, California and Hawaii.  Hughes Dep. 14:15-15:19.

19           Whether or not Hughes exercised ad hoc authority over Hartford policy requires a

20   factual inquiry not suitable for summary judgment.   The White court is in accord,

21   reasoning that "[t]he scope of a corporate discretion and authority under out test is … a

22   question of fact for decision on a case-by-case basis."  Id. at 567.  Consequently,

23   Hartford cannot qualify for summary adjudication under a managing agent rationale.

24           With respect to the second prerequisite for a potential award of punitive damages,

25   whether or not Defendants acted with "oppression, fraud, or malice," Hartford fails to

26   carry the day as to that argument either, largely for the reasons already stated in this

27   Memorandum and Order.  Malice is defined as "despicable conduct which is carried on

28   by the defendant with a willful and conscious disregard of the rights or safety of others."

1   Cal. Civ. Code § 3294(c)(1).  Conduct in knowing violation of the law may satisfy the

2   requisite showing for punitive damages.  See, e.g., Flyer's Body Shop v. Ticor Title Ins.

3   Co., 185 Cal. App. 3d 1149, 1154 (1986).  Here, there are factual disputes about

4   whether Hartford engaged in the interactive process in good faith, retaliated against

5   Plaintiff for attempting to secure reasonable accommodations, and facilitated an

6   environment that left Plaintiff no choice but to resign, thereby constructively terminating

7   her employ. Summary adjudication as to Plaintiff's punitive damages claim would

8   therefore be improper.

9

10                                          **CONCLUSION**

11

12        For all the foregoing reasons, Defendants' Motion for Summary Judgment, or

13   Alternatively for Partial Summary Judgment (ECF No. 42) is DENIED in its entirety.

14        IT IS SO ORDERED.

15   Dated:  September 24, 2013

16

17

18   _____
     MORRISON C. ENGLAND, JR, CHIEF JUDGE
19   UNITED STATES DISTRICT COURT

20

21

22

23

24

25

26

27

28